# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

Four devices currently located at 633 W. Wisconsin
Avenue, Suite 803, Milwaukee, Wisconsin, 53203 and
described as (a)1 – (a)4. See Attachment A.

)
)
)
)
)
)

Case No. 19-8054(NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Four devices currently located at 633 W. Wisconsin Avenue, Suite 803, Milwaukee, Wisconsin, 53203 and described as (a)1 – (a)4. See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
21 U.S.C. §§ 841(a)(1) and 846; and 18 U.S.C. § 1956(h)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jeffrey Hale, DEA TFO
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: February 4, 2019

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Jeffrey Hale, being first duly sworn, hereby depose and state as follows:

## I.     INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a state certified law enforcement officer with the Wisconsin Department of Justice, Division of Criminal Investigation, and have been since October of 1999. Prior to that, I was a Police Officer with the Milwaukee Police Department. I have worked full-time as a law enforcement officer for the past 22 years. I am also a federally deputized task force officer with the United States Drug Enforcement Administration (DEA).

3.     As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover

1

transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

4.      I have participated in many drug trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. In many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## II.      IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.      The property to be searched is described as follows:

(a)1.   Apple iPhone Model number A1387.

(a)2.   Alcatel Flip Cellular phone.

(a)3.   Apple iPhone model A1687.

(a)4.   HP Pavilion Laptop.

2

(b)1.  Samsung Galaxy S8 Smartphone.

(b)2.  HP laptop with thumb drive inserted into laptop.

(b)3.  Amazon Kindle tablet.

(b)4.  Samsung Galaxy S5 smartphone.

(b)5.  ZTE smartphone.

(b)6.  Dell computer tower.

(c)1.  Black Apple iPhone with black rubber "tech21" case. Unknown model number.

(c)2.  Silver Apple MacBook Pro laptop, Model #: A1211.

(c)3.  Black Dell "Inspiron 15" laptop computer, S/N: GK6P832.

(c)4.  Silver Apple 16GB iPad with gray case, S/N:DMPJMND5DKPH.

(c)5.  Black 8GB tablet, unknown make or model.

(c)6.  Silver Apple iPad with cracked front screen, S/N: F9FN80XSFCM8.

(c)7.  Silver Samsung 16 GB cellphone, Model #: SM-J327T1, SW:

J327T1UVU1AQK6, IMEI: 354256/09/103958/6.

(c)8.  Silver Samsung 16 GB cellphone, Model #: SM-J327T1, SW:

J327T1UVU1AQK6, IMEI: 354256/09/194390/2.

(c)9.  Silver iPhone with cracked screen, Model #: A1533, IMEI: 013983003140300.

(c)10. Silver iPhone S with cracked screen, Model #: A1688, IC: 579C-E2946A.

(c)11. Black iPod, 8GB, S/N: 9C020RPV75J.

(c)12. Silver iPod, S/N: CCQNP3J1G22Y.

(d)1.  Samsung Chrome Notebook, black, S/N: 0Q9L91HJ400907Y.

(d)2.  Motorola androidone cellular telephone, silver, S/N: ZY224KQN3F.

(e)1.  Buffalo brand 1.0 TB High-Speed Portable Storage, S/N: 80223244903364.

3

(e)2.   Silver thumb drive in black leather "FL STUDIO" case, No S/N.

(e)3.   Acer Aspire E5-575 Series laptop computer, S/N:

NXGLBAA001706263517600.

(e)4.   Samsung cellular telephone, silver, Model: SM-J327P, DEC:

089162138406821714, HEX: 3551008681752

(e)5.   Samsung cellular telephone, black, Model: SM-S337TL (GP), S/N:

R28K50AALNH

7. Devices 6(a)1 – 4, (b)1 – 6, (c)1 – 12, (d)1 – 2, (e)1 – 5 and (f)1 – 2,  collectively the "Devices," are currently located at 633 W. Wisconsin Avenue, Suite 803, Milwaukee, Wisconsin, 53203.

7.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## III.   PROBABLE CAUSE

### A.   Background of the Investigation

9.   ·   I believe that the marijuana trafficking and money laundering activities of this organization began on or before at least the beginning of 2013 based upon all investigative activities undertaken during the investigation. The investigative activities included, but are not limited to, confidential informant (CI) interviews, other witness interviews, telephone, banking, airline, car rental, other documentary evidence and analysis.

10.     In 2017, members of the Milwaukee, Wisconsin Police Department initiated an investigation into a large-scale marijuana drug trafficking organization (DTO) led by Josef K. Habib and others. Habib acquired large shipments of marijuana from out of state source(s), which Habib then distributed in the greater Milwaukee area and possibly elsewhere. The investigation

4

also revealed that Habib used stash locations in the greater Milwaukee area, including Milwaukee and Greenfield, WI.

11.     On January 8, 2018, law enforcement officers conducted surveillance at an identified stash location, 4100 W. Hillcrest Drive, apartment #207, Greenfield, WI, and observed a vehicle known to be driven by Habib, a black Nissan Maxima, bearing WI license plate number 242LWL, parked in a visitor parking stall at 4100 W. Hillcrest Drive, near the garage for apartment #207. The overhead garage door on the attached garage corresponding to #207 was fully open.

12.     Law enforcement subsequently observed a Toyota Highlander bearing Virginia license plates arrive. The vehicle drove into the open garage corresponding to apartment #207. The garage door immediately closed.

13.     Approximately 20 minutes later, the overhead garage corresponding to apartment #207 opened, and law enforcement observed a white male enter the driver's seat of the Toyota; Habib stood in front of the Toyota. The Toyota pulled out and drove away. Habib entered the Nissan Maxima and drove it into the garage corresponding to apartment #207; the overhead door then closed.

14.     Approximately 25 minutes later, the overhead door of the garage for apartment #207 again opened, and the Nissan Maxima exited. Law enforcement officers observed that Habib was the driver and sole occupant of the vehicle.

15.     Law enforcement authorities conducted a stop of the Nissan Maxima. Law enforcement officers who were familiar with the odor and appearance of marijuana detected an odor of marijuana emanating from the vehicle, and observed a large black plastic garbage bag on the rear passenger seat. Based upon the earlier investigation, law enforcement officers believed that Habib used these garbage bags to transport quantities of marijuana. A search of the garbage

5

bag revealed foil sealed packages each of which contained suspected marijuana.

16.    A complete search of the Nissan Maxima revealed a total of approximately 64 pounds of suspected marijuana within the trunk and rear passenger area of the vehicle. A field test conducted on the suspected marijuana yielded positive results for the presence of THC.

17.    On January 8, 2018, law enforcement authorities also conducted a stop and search of the Toyota Highlander. This search revealed approximately 160 pounds of marijuana and in excess of $300,000 in U.S. currency.

18.    Search warrants were subsequently executed on January 8, 2018, at 4100 W. Hillcrest Drive, apartment #207, Greenfield, WI, believed to be the stash location, and at the residence of Habib, located at 117 W. Walker Street, apartment #303, Milwaukee, WI.

19.    Law enforcement officers found approximately 206 pounds of marijuana at 4100 W. Hillcrest Drive, apartment #207. Additionally, law enforcement located and seized approximately 16 pounds of marijuana, in excess of $21,500 in U.S. currency, and a loaded .40 caliber pistol from 117 W. Walker Street, apartment #303. Also seized were items consistent with the packaging and distribution of controlled substances.

20.    The majority of the marijuana seized was contained in mylar vacuum sealed bags, some within black plastic construction bags.

21.    Rental documents obtained for the stash location at 4100 W. Hillcrest Drive revealed that it had been rented in 2017 by Fredric Birault, and an individual named "Larry Peters" was the contact listed for Birault, with an email address of larrygoeshardaf@gmail.com. "Larry Peters" was subsequently determined to be an alias for Lev Reys, and the email address larrygoeshardaf@gmail.com was determined to be an email address associated with Lev Reys. The subscriber for utilities in the stash apartment were in the name of Birault.

6

22.     When Habib moved to Milwaukee in approximately December 2016, law enforcement learned that Habib resided at 814 E. Kilbourn Ave., Milwaukee, WI. The subscriber for utilities at the Kilbourn Avenue location were in the name of Robert Malkin. Habib resided there until February 2017, at which time he moved to another stash location at 4250 S. Ravinia Dr., #103, Greenfield, WI.

23.     Rental documents obtained for 4250 S. Ravinia Dr., #103, Greenfield, WI, located in the same apartment complex as 4100 W. Hillcrest Drive #207, revealed that the Ravinia Drive location was rented by Robert Malkin in February 2017. For the rental application credit/income fields on the application, Malkin supplied copies of three checking account statements for a joint account at JPMorgan Chase Bank, in the names Robert Malkin and Sydney Malkin, Robert's daughter, Account #***0130. The account mailing address on two statements (December 2016 and February 2017), listed 226 W. Ojai Ave., #101, Ojai, CA. The address on the statement for January of 2016, which may have been provided in error, listed an address of 3639 W. Harbor Blvd., #201, Ventura, CA. The insurance for the apartment rental was under the names Robert Malkin and Sydney Malkin, with an address of 226 W. Ojai Ave., #101, Ojai, CA. Robert Malkin paid the initial monthly rent of $1,130 for this stash location in money orders. The utilities were subscribed to in Sydney Malkin's name at the Ravinia Drive apartment.

24.     Rental documents obtained for the residence of Josef Habib, 114 W. Walker Street, Milwaukee revealed that in April 2017 the apartment had been rented by Corianne Markowski, the girlfriend of Josef Habib. In the rental application, Markowski listed her employment since 2012 as Malkin Properties, 3639 W. Harbor Blvd., #201, Ventura, CA. Robert Malkin was listed as Markowski's supervisor with a contact telephone number of 805-279-5393, a number known to be utilized by Robert Malkin. Markowski also listed her previous residence as an address known

7

by law enforcement through database checks as a residence owned by Malkin Properties in West Mifflin, PA.

25. Information received from the Wisconsin Department of Workforce Development regarding Markowski's claimed wages revealed that she lived in Wisconsin from 2012 – 2017; not 6719 Buchannan Avenue, West Mifflin, PA 15120, as alleged in her rental application.

**B.  Historical Information**

26. In January 2018, a confidential informant (CI) began cooperating in the continuing investigation into the above-referenced DTO. The CI provided information about the membership, structure, and customs of the nation-wide marijuana DTO. Law enforcement has corroborated the CI's information through various public databases, documents obtained during the investigation, asset and ownership records, law enforcement records, physical observations, other CI information, and review of recorded jail calls detailed, in part, below. The CI's information has not found to be false or misleading. The CI has no criminal record and is receiving consideration in connection with a pending drug case from the United States Attorney's Office for his/her cooperation with law enforcement. The CI has also received monetary compensation for expenses. For these reasons, I consider the CI to be reliable.

27. The CI stated an individual named "Bob," subsequently identified as Robert Malkin, obtained in excess of 1,000-pound quantities of marijuana in California, which were subsequently transported by semi-tractor trailer to a location in Maryland. Parts of the shipments were then distributed to various locations in the U.S., including the Virginia/Washington D.C. area; Pittsburgh, PA; North Carolina; and Milwaukee, WI. The CI further stated Robert Malkin operates a property management company, and is believed to launder drug proceeds through the company by purchasing properties.

28. In 2013 and 2014, the United States Postal Service seized and forfeited mailed

8

parcels from Robert Malkin to his wife, Susan Malkin, which contained large sums of currency. In 2013, $25,000 was seized, and in 2014, an additional parcel containing over $149,000 was seized. In addition, based upon a civil forfeiture complaint filed in U.S. District Court, Central District of California, in July 2014, the 2014 parcel was shipped by Robert Malkin in Clairton, Pennsylvania to Susan Malkin, at a UPS store in Ventura, CA. The telephone number used by Robert Malkin on the parcel mailing in 2014 was 805-279-5393.

29. The CI further provided information regarding the hierarchy of the DTO. According to the CI, Robert Malkin financed the marijuana trafficking organization. Lev Reys was in charge of the transportation of the marijuana from California to Maryland, and other locales. Seth Jacobs held a similar status in the organization as the main distributor/overseer of the Virginia/Maryland/DC. marijuana distribution. Joseph Habib directed aspects of the East Coast operation along with running the Milwaukee market. Nahom Hagos[1] and Alae Arbi sold quantities of the shipments in the Maryland/Alexandria Virginia and Washington D.C. areas on behalf of the organization.

30. ʻIn 2016, Seth Jacobs was named in a DEA investigation when law enforcement seized $29,950 in suspected drug proceeds from him at Dulles International Airport.

31. During the course of the investigation, case agents learned that Jason Malkin, Robert Malkin's nephew, also participated in operational logistics of the DTO as set forth below.

32. In November 2017, Lev Reys recruited the CI to reside at a stash location in Germantown, MD. The CI met Lev Reys through a mutual associate, Fredric Birault, both of whom

---

[1] In 2011, Nahom Hagos was one of 18 individuals charged by the U.S. District Court in Alexandria, Virginia with conspiracy to distribute marijuana. The individuals obtained shipments of marijuana from California and distributed it in that district, including but not limited to, college campuses in other states. Hagos pled guilty and was sentenced to 18 months prison.

Case 2:19-mj-00805-NJ   Filed 02/04/19   Page 10 of 41   Document 1

the CI knew to reside in California. Birault told the CI that Reys was looking for someone to assist in the organization's marijuana trafficking organization. The DTO needed someone to oversee the marijuana stash and off load locations in Maryland. Reys stated he would pay the individual for those duties. Birault declined the offer as Birault did not wish to move to Maryland. Reys advised the CI that a coconspirator named "Scotty," subsequently identified by law enforcement as Scott Jungwirth, had occupied the Maryland stash house just before the CI. Reys stated Jungwirth had been tasked with the same duties as the CI, but Jungwirth no longer occupied the stash house.

33. According to the CI, the semi-tractor trailer shipments of marijuana that arrived from California were off loaded from hidden compartments in the trailer at a hangar in Hagerstown, MD. Two locked large steel construction bins in the hangar were used to store marijuana when the trailers were picked up.

34. The marijuana was then transported for re-packaging and distribution at the stash house in Germantown, MD. The CI was responsible for oversight of the shipments of marijuana upon their arrival in Maryland by keeping accurate counts of the weights of marijuana that were shipped to the hangar and processed at the stash house.

35. The CI was also in charge of the inventory of the bags in the hangar. Upon obtaining quantities of marijuana, the CI resealed and renumbered the bags with the current accurate count of the bags/pounds. The marijuana was packaged in mylar bags, and vacuum sealed bags inside black plastic construction bags.

36. The CI was also responsible for collecting, processing, and packaging large quantities of currency from various coconspirators that represented the proceeds from marijuana sales.

37. After the CI moved to the stash house in Germantown, Maryland which was just

10

before Thanksgiving 2017, Reys took the CI shopping for house supplies and food at a Wal-Mart near Germantown. A day or two later, Reys and the CI went to CubeSmart in Gaithersburg where Reyes rented an interior storage unit, #4030. Reys told the CI to put the rental in the CI's name, and Reys paid for the rental. Reys then purchased a Rigid steel construction bin. Reys and the CI transported it to CubeSmart and put it in the storage unit. Reys provided the CI with the spare keys for the storage unit lock and two padlocks that he put on the construction bin.

38.     According to the CI, the storage unit and bin were used for storing the U.S. currency that the DTO accumulated through its marijuana sales before it was transferred to the hangar. At the hangar, the cash was loaded into hidden compartments in the semi-trailers for transport to California.

39.     The DTO used hidden compartments in the semi-trailers to transport the marijuana and marijuana proceeds. The trailer transporting marijuana from California to Maryland contained what appeared to be lumber stacks, but the lumber stacks were actually hollowed out on the inside with the top layer hinged so that the entire compartment could be accessed. The other trailer, which transported the currency back to California, contained a fake movie production set with equipment inside, restrooms, generators, and other similar detailing. Currency was hidden in a large steel Rigid construction bin in the front of the trailer, which area could only be easily accessed by crawling under the generator mounted near the rear trailer door and over other equipment.

40.     The truck drivers hauling the trailers allegedly did not know that they were transporting either marijuana or money. Reys stated that they would never use the same driver more than once.

41.     The CI observed approximately 30-40 black plastic construction bags within the fake lumber stacks. Each construction bag normally contained six to eight mylar bags, each of

11

which generally contained five pounds of marijuana. The CI stated that the shipments from California contained approximately 1,200 – 1,600 pounds per shipment.

42.     The CI was present at the hangar on approximately four occasions when semi-trailers were delivered or taken out, and Reys was present on two of those occasions.

43.     On approximately three other occasions, the CI went to the hangar alone with instructions from Jacobs to bring back five to six contractor bags of marijuana to the Maryland stash house.

44.     The CI identified Josef Habib as a Milwaukee based distributor for the DTO. The CI had obtained large quantities of U.S. currency from Habib, which the CI then transported back to Maryland.

45.     The CI first met Habib when Jacobs and Reys directed the CI to fly to Milwaukee. The CI flew to Milwaukee on Southwest Airlines from Baltimore and the CI rented a car, believed to be from Enterprise. The CI was directed to contact and meet with "Joe." The CI subsequently met Habib by Hamburger Mary's in Milwaukee. Habib delivered money to the CI, and the CI observed that Habib drove a black car. The CI then drove the money to the stash house in Germantown, MD. On another occasion, the CI met Habib at the stash house in Maryland.

46.     The CI identified Lev Reys as a close associate of Robert Malkin. The CI stated Reys' role in the DTO was overseeing transportation of the shipments of marijuana from California to Maryland and other locations. The CI stated Reys has told the CI that Reys' goal was to accumulate numerous properties in the Pittsburgh, Pennsylvania area utilizing marijuana distribution proceeds and then accumulate further wealth through ownership and rental of the properties.

47.     The CI identified an individual named "Seth," subsequently identified as Seth

12

Jacobs, as a main Maryland/Virginia based distributor for the DTO who frequented the stash house in Maryland and oversaw a daily worker at the stash house.

48.     The CI retained receipts from the CI's trips which the CI then provided to Jacobs. Jacobs reimbursed the CI with cash for the CI's drug-related expenses.

49.     The CI also identified an individual named Alae/Elae subsequently identified as Alae Arbi, and an individual named "Nash," subsequently identified as Nahom Hagos. Arbi and Hagos frequented the stash house in Germantown, Maryland and obtained multi-pound quantities of marijuana weekly.     Arbi and Hagos then sold the marijuana in the Maryland/Virginia/Washington D.C. area on behalf of the DTO.

50.     Arbi normally frequented the stash house with Seth Jacobs and ran errands for him. Arbi also ran a marijuana delivery service for Jacobs in the Washington, D.C. area. Jacobs and Arbi had a business name on Weed Maps, a marijuana application that each of them had installed on their cell phones. Arbi also came to the stash house at night to smoke marijuana.

51.     On average, Hagos came to the stash house every few days, sometimes multiple days in a row, and the CI overheard Hagos telling a stash house worker that Hagos needed 40 units of something and a few units of something else. Based upon his familiarity with the DTO, the CI knew that Hagos obtained pounds of different strains of marijuana for distribution.

52.     The CI identified the CI's two cellular telephone numbers. The CI also stated that a cellular telephone that the CI had left at the stash house in Maryland had been provided to the CI by Lev Reys in November 2017 as a cellular telephone number to utilize for contacting coconspirators in the DTO. The CI had changed cellular telephones because of service related issues.

53.     Reys and Jacobs told the CI that Jungwirth was an older white male. The CI was

13

also told that Jungwirth, the individual previously performing the duties of the CI, had driven the Toyota Highlander. The Highlander had been as the transportation vehicle for Jungwirth. Subsequently, this vehicle was provided to the CI to use for deliveries and pickups, and other drug-related duties.

54.     A check of the title history for the Toyota Highlander revealed that on August 1, 2017, it had been titled in the name Scott Jungwirth, 2014 Jewell Ln., Redding, CA. The vehicle title was then transferred into the name of the CI on November 21, 2017.

55.     The CI stated that on the day of Habib's arrest, Reys first directed the CI to stop at another stash location in Milwaukee, which the CI identified as 7992 N. 107th St., #6 Milwaukee. Prior to the CI's departure from Germantown, MD, Reys gave the CI a set of keys for the apartment. Reys directed the CI to take the marijuana from the 107th Street location and deliver it to Habib. The CI estimated there were approximately 300 pounds of marijuana at the stash house on 107th street.

56.     The CI then took the marijuana to Habib at the 4100 W. Hillcrest Dr. location. Habib examined the different strains of marijuana and took approximately 140 pounds of the marijuana, but left the CI with the remaining amount. Habib also put the bags and boxes containing the U.S. currency in the Highlander for the CI to take back to Maryland.

57.     The CI was uncertain about what to do with the marijuana as the CI had never driven marijuana that had already been delivered to another city back to the Maryland stash house. The CI attempted to contact Jacobs and Reys via the Telegram application they utilized on their cellphones; however, neither answered.

C.     Continuing Investigation

58.     On January 9, 2018, case agents conducted a consent search at 7992 N. 107th St., #6, Milwaukee, WI. Law enforcement observed that no one resided in the apartment. Items

14

observed and seized included plug-in air fresheners, a box of rubber gloves, and loose locksets for doors. The air fresheners were the same type as what had been observed at the stash house at 4100 Hillcrest Dr., #207.

59.     Records received from the property management company for 7992 N. 107th St., #6, Milwaukee revealed that the rental application was in the name Fredric Birault, 23907 Windward Ln., Valencia, CA with an application date of September 20, 2017, and a rental date starting October 20, 2017. An email address of larrygoeshardaf@gmail.com was provided along with a verification of income letter from a "Larry Peterson," and telephone number 818-299-0267. Communications from the email address larrygoeshardaf@gmail.com, stated that Birault was employed by Oasis Management, Beverly Hills, CA as a property manager since 2012. The telephone number and email address are known to be used by Reys.

60.     On January 9, 2018, law enforcement from Montgomery County Sheriff's Department executed a search warrant at the stash house in Germantown, MD based upon the information developed in this investigation. A search of the residence revealed evidence consistent with the information provided by the CI that the residence served as a stash location for the marijuana distribution organization. Law enforcement recovered thousands of unused vacuum sealed bags, marijuana remnants, a money counter, latex gloves, and the cellular telephone provided by Reys that the CI identified as located at the stash house.

61.     In January 2018, case agents traveled to Maryland with the CI and conducted a follow-up consent search at the stash house located in Germantown, Maryland utilizing the CI's keys. At that time, law enforcement seized additional items, including a crumpled Burke & Herbert Bank ATM debit card receipt dated December 10, 2017, from a branch at 6210 Interparcel Rd., Alexandria, VA, from the basement, and a paid parking stub, dated December 20, 2017, from

15

a parking garage in Washington D.C. from the garbage.

62.     Bank records and parking management company records received through subpoenas revealed that the debit card receipt corresponded to a bank account of Alae Arbi. The parking stub receipt was parking paid for using a credit card issued to Nahom Hagos.

63.     Law enforcement's review of records received from Burke & Herbert Bank revealed that the debit card ATM withdrawal receipt seized from the stash house in Germantown, MD, was tied to checking account number *4043, in the name of Alae Arbi of 7507 Shirley Hunter Way, Alexandria, Virginia 22315.

64.     Further review of records received from Burke & Herbert Bank revealed that the debit card used for the charge on the parking stub receipt seized from the "stash house" in Germantown, MD, was a match to a debit card for a checking account ***1403, in the name of Nahom Hagos of 7704 Ousley Place, Alexandria, Virginia 22315.

65.     Law enforcement also conducted consent searches at the CubeSmart storage unit in Gaithersburg, MD and the rented warehouse hangar in Hagerstown, MD.

66.     Upon searching the storage unit, the special agents observed a Rigid steel construction bin inside the unit, which was padlocked. A set of keys recovered from the stash house in Germantown, MD opened the locks on the bin. The bin was empty.

67.     A review of surveillance video received from CubeSmart showed Reys and the CI entering the storage unit in November 2017, on the day of the initial rental, and a few days later. Both are observed on video unloading the Rigid steel construction bin from the Toyota Highlander, and taking it inside the storage unit.

68.     Upon searching the warehouse hangar, a tractor-trailer was observed parked inside. The interior of the trailer contained two false lumber and plywood stacks. The top layer of false

16

lumber was hinged on each stack, which revealed empty hollowed out compartments. There were also two additional Rigid steel construction bins in the warehouse hangar.

69.     A check of the California license plate number on the trailer in the hangar revealed that the trailer was registered to Fredric Birault, at 23907 Windward Ln., Valencia, CA.

70.     Subpoenaed records were obtained from World Wide Freight Carrier, LLC.  On April 9, 2018, Robert Malkin, from email address bobmalkin@gmail.com, communicated with an employee at World Wide Freight Carrier regarding "Trailer pick up."  Robert Malkin requested "pick up" at "18238 shoalwater rd 21742," which your affiant knows is the address for the warehouse hangar previously identified by the CI, and examined by case agents.  Robert Malkin provided a delivery address of "2509 N. Ventura Avenue, Ventura 93001."  The shipping rate was listed as $4,895.00.

71.     Rental documents obtained for the stash house in Germantown, MD, revealed that the residence was rented by Robert Malkin in July 2017.  Rental documents for the warehouse hangar revealed that it was also rented by Robert Malkin in September 2017.

72.     During the week of January 8, 2018, an attorney contacted law enforcement and advised that an individual who identified himself by the name of "Seth" had contacted the attorney regarding the CI, and inquired as to the attorney representing the CI. The attorney stated that the telephone number "Seth" called from was a "707" area code number. The CI stated the CI doesn't know any other individual named "Seth" other than Seth Jacobs. The CI believed that Jacobs was the individual who called the attorney because Reys had told the CI in the past that if the CI was ever arrested the organization would obtain an attorney for the CI.

**D.     DTO's Methods of Communication**

73.     The CI identified various telephone numbers and usernames of the coconspirators from an encrypted cellular telephone application called Telegram. This application allowed the

17

coconspirators to contact one another in a manner arranged to avoid detection by law enforcement because it provided a "secret chat" feature. The CI stated that the usernames the coconspirators utilized in the applications were fictitious names that the coconspirators had selected. The CI stated all of the known individuals primarily used the secret chat and voice calling features on Telegram. The individuals whom the CI identified also frequently changed cellular telephone numbers to avoid detection by law enforcement. The CI knew Jacobs carried three cellphones at a time, and Reys used more than one cellphone.

74.     Law enforcement authorities reviewed the cellular telephone of the CI, and the Telegram application on the CI's cellular telephone. The CI identified the following names and Telegram contacts: "Joe" with a fictitious name of "Steven Trace" and username @Ralfy434, Telegram telephone number 414-888-0646 as the contact information for Josef Habib; the name "Larry Peters" and username @LarryPeters, Telegram telephone number 818-299-0267 as the contact information for Lev Reys; the name "Alle" with no telegram telephone number saved as the username for Arbi; the name "Ben," whom the CI identified as a daily stash house worker, with a fictitious name of @timwilliams (a/k/a Paul Ramon) with no telephone number saved as "Ben;" the name "Bob" with username name "BM" with no telephone number saved as Robert Malkin; and, the name "Seth" with the fictitious username "Rick Orozco" as the username of Jacobs.

75.     Outgoing calls were observed to the Telegram usernames of Reys and Jacobs during the time period after the CI left Habib's 4100 W. Hillcrest Dr. stash location on January 7, 2018.

76.     Law enforcement authorities also observed numerous secret chats between the CI and the other referenced user names.

77.     Law enforcement authorities further observed numerous pictures time stamped December 21, 2017, of notebook pages containing handwritten notations of abbreviated names for marijuana strains with numbers next to the abbreviations on the CI's phone. The CI stated that they were pictures taken by the CI that the CI then sent to Reys and Jacobs documenting the pounds of various types of marijuana that was remaining on that date at the hangar. The CI had been directed to pick up a quantity of marijuana at the hangar and bring it back to the stash house in Germantown, MD.

78.     On January 25, 2018, law enforcement authorities obtained search warrants from the Honorable Magistrate Judge William E. Duffin for the two cellular telephones of Habib, 414-888-1856 and 571-639-1582. A review of the telephones revealed contacts in Telegram with a name entered as "Bdigi," telephone number 805-279-5393 (known to be the telephone number of Robert Malkin), and encrypted conversations between that number and Habib's cellular telephone. Additional telegram usernames were Paul Ramon with username @Timwilliams (identified by the CI as the individual "Ben," whom the CI identified as a daily Maryland stash house worker) with calls between the two.

79.     Law enforcement authorities also observed numerous chats and secret chats between Habib's cell phone and other unidentifiable uernames on Telegram. Some of the chats contained pictures of notebook pages depicting handwritten drug ledgers, including lists of various marijuana strains. These ledgers also listed corresponding numerical quantities and monetary amounts, including pages entitled "Milw. Inventory," and "D.C. Inventory" along with dollar amounts totaling over $1,000,000. Some of these chats were with Paul Ramon.

80.     Database checks for telephone number 805-279-5393 revealed the telephone number is listed to Robert Malkin. Further records obtained through subpoenaed documents

19

related to rental locations, banking and other records revealed Robert Malkin used telephone number 805-279-5393.

## E.    Financial and Travel Information

### 1. Financial Information

81.    A review of records received from Burke & Herbert Bank regarding the checking account for Nahom Hagos revealed the following:

a.    Nearly all deposits into Nahom Hagos' checking account from December 11, 2015, through September 30, 2016, were direct deposits from his listed employer at that time, Global Engineering Solutions.

b.    From October 14, 2016, through March 29, 2018, nearly all deposits into Hagos' checking account consisted of currency or Venmo cash-outs. As per Venmo's website on June 1, 2018, "Venmo is a free digital wallet that lets you make and share payments with friends." The annual totals for the currency deposits were $11,615 in 2016, $31,659 in 2017, and $17,220 through March 29, 2018.

c.    Numerous electronic expenditures were made from Nahom Hagos' checking account to various retail establishments in the Gaithersburg and Germantown, MD areas, beginning in mid-2016. Those expenditures were frequently made at fast food establishments while direct deposits were being made to Hagos' account. Electronic expenditures at fast food restaurants decreased significantly when currency deposits into Hagos' account increased. Based upon affiant's training, experience, and familiarity with the investigation, affiant believes that this indicates Hagos began making food purchases with un-deposited currency.

d.    Multiple electronic expenditures were made in the Milwaukee, Wisconsin area during December 14 – 18, 2016, which is when other members of the DTO were in Milwaukee.

82.    A check with the State of Virginia Employment Commission revealed the following:

a.　　No wages for Seth Jacobs since the third quarter of 2017, with a yearly total for the first three quarters of 2017 as approximately $6,000; in 2016 approximately $13,300; in 2015 approximately $12,200; and in 2014 approximately $17,700.

b.　　No wages claimed for Alae Arbi in any year.

c.　　No wages for Mohammed Omar, another co-conspirator, since the second quarter of 2015, with a yearly total for the first two quarters of 2015 as approximately $12,200.

### 2. Travel Information

83.　　The flight, rental car, financial information, and cellular call and location data establish the DTO's known travels in furtherance of the conspiracy to include, but not limited to, travel to Los Angeles, San Francisco, Sacramento and Garberville, California; Milwaukee, Wisconsin; Maryland; and Washington D.C.

84.　　Law enforcement authorities know that the airport in San Francisco is the last major airport in closest proximity to the Garberville/Humboldt County areas of northern California. In addition, Sacramento, California is known as a major trucking/shipping location for shipments of marijuana emanating from northern California.

85.　　In part, a review of received subpoenaed airline flight records and rental vehicle records revealed the following:

a.　　Habib flew 21 times from the Maryland area in 2015 and 2016 with 15 flights to San Francisco, three to Sacramento, and three to Los Angeles. Approximately seven flights did not list corresponding outbound/inbound flights; most of these flights occurred from Baltimore to San Francisco. In 2017, Habib flew 17 times; most flights departed from Milwaukee with one flight to San Francisco, nine to Sacramento, three to Los Angeles, and four flights to Washington, D.C. Two flights did not include corresponding outbound/inbound flights; one such flight occurred from Milwaukee to Washington D.C., and one from Los Angeles to Milwaukee.

b.     Approximately 18 of Habib's airfares were paid for by Seth Jacobs, including four when Habib flew with other individuals, all of which occurred in 2015 and 2016.

c.     Jacobs paid for an airfare for Habib, Arbi, and a third individual; and, Hagos paid for one of Habib's flights.

d.     Jacobs flew 11 times in 2015/2016 from the Maryland area with nine flights to San Francisco and two to Los Angeles. Five flights to San Francisco did not list a corresponding return flight.

e.     Mohammad Omar flew once in 2016 with Habib from Maryland to San Francisco.

f.     Scott Jungwirth flew once from San Francisco to Los Angeles in 2016, and flew once from Redding, CA to Baltimore in 2017.

g.     Lev Reys flew 14 times in 2017, with eight flights to the Washington D.C./Baltimore area, one to San Francisco, and five to the Milwaukee/Chicago area, all of which occurred between September, 2017, and January, 2018.

h.     Robert Malkin flew six times in 2016, with five to Washington D.C./Baltimore, and one to Sacramento. In 2017, Malkin flew 11 times, with three flights to the Washington D.C./Baltimore area, four to the Milwaukee/Chicago area, one to San Francisco, and three flights to Sacramento. Most of Malkin's flights originated from either the Los Angeles or Las Vegas area, and approximately three flights listed no corresponding return flights. This included two flights in September 2016, when Malkin flew to Baltimore, and one in August 2017, when Malkin flew to Milwaukee.

86.     A review of rental vehicle records revealed the following:

a.     In 2015, Habib rented eight vehicles, with four rented in San Francisco and

22

returned in Alexandria, Virginia; one vehicle rented in San Francisco and returned in Reno, Nevada; one vehicle rented in Reno and returned in Washington D.C.; and one vehicle rented and returned in Reno.

b.      In 2016, Jacobs rented seven vehicles, with five rented and returned in San Francisco, and two rented and returned in Sacramento.

c.      In 2017, Reys rented 14 vehicles, with two in Milwaukee, ten in Baltimore, and two in Chicago, all of which were returned to the same city as rented; and one in 2018 rented and returned in Baltimore.

d.      In 2017, Jason Malkin rented 15 vehicles, seven in Milwaukee with six returned in Milwaukee and one returned in Pittsburgh; Malkin rented two vehicles in Pittsburgh that were returned in Baltimore; Malkin rented one vehicle in Chicago that was returned in Pittsburgh, and he rented and returned five vehicles in Baltimore. Each rental listed Jason Malkin as the renter, and each rental listed his driver's license and cellular telephone number 310-948-4015. Based upon their familiarity with the investigation, law enforcement knows that Jason Malkin used this number.

e.      In 2016, Hagos rented three vehicles, one in Milwaukee, one in Washington D.C., and one in Sterling, Virginia, all of which were returned to the same cities. In 2018, Hagos also rented one vehicle that was rented and returned in Washington D.C.

f.      In 2016, Jungwirth rented one vehicle in Redding. In 2017, Jungwirth also rented two vehicles; one in Baltimore and one in Sacramento, all of which were returned to the same cities.

g.      In 2016, Robert Malkin rented seven vehicles; Malkin rented four in the Baltimore/Washington D.C. area; one in Redding; and two in Sacramento, all of which were

23

returned to the same cities except the Sacramento vehicle was returned to Los Angeles. In 2017, Malkin rented 17 vehicles; two in Milwaukee, six in Sacramento, and nine in the Baltimore/Washington D.C. area. All vehicles were returned to the same city except three rented in Sacramento were returned twice in San Francisco and once in Los Angeles. In 2018 Malkin rented three vehicles, with two rented in Sacramento and one in San Francisco, all of which were returned to the same cities.

87. Between January 2017, and September 2017, on at least eight different occasions Robert Malkin and Jason Malkin incurred credit card expenses for airline flights and/or rental vehicles in Milwaukee. Some of these rentals coincided with the establishment of stash houses in Milwaukee. For example, on February 25, 2017, the credit card assigned to Jason Malkin incurred a rental car expense in Milwaukee, WI. The following day, on February 26, 2017, the Jason Malkin card incurred an expense for Jason Malkin to fly from Los Angeles, CA to Milwaukee, WI. On February 28, 2017, the rental application in the name of Robert K. Malkin for the Ravinia Drive stash house in Greenfield, WI, as well as proof of Robert Malkin's income, were submitted through BobMalkin@gmail.com. On March 1, 2017, the Jason Malkin credit card incurred another rental vehicle expense in Milwaukee, WI. Also on March 1, 2017, Habib flew from Milwaukee, WI to Sacramento, CA, a transportation hub for the shipment of marijuana in northern California. In addition, on March 1, 2017, Robert Malkin rented a vehicle in Sacramento and returned it one day later, which coincided with Habib's departure from Sacramento back to Milwaukee.

88. On numerous other occasions in 2017 Lev Reys, Robert Malkin, Jason Malkin, and Scott Jungwirth rented vehicles in Baltimore, MD.

89. Through a map review, your affiant noted that the airports in Washington D.C. and Baltimore, MD are the same proximate distance from the stash house in Germantown, MD, and

24

the warehouse hangar in Hagerstown, MD. Previously the CI stated that coconspirators would utilize either airport when they traveled to Maryland.

90.     On October 6 – 8, 2016, expenditures on the Robert Malkin credit card issued to Jason Malkin were incurred at a hotel in Garberville, Maryland. A review of the records revealed that Habib and Jacobs flew from Baltimore to Los Angeles on October 7, 2016.

91.     In November 2016, the Robert Malkin credit card incurred expenses for a flight in his name from Los Angeles to Pittsburgh, and he rented a car in Pittsburgh. On November 19, 2016, Malkin returned this vehicle in Miami, Florida. On November 19, 2016, Habib and another individual flew to Miami and returned on November 19, 2016. On November 20, 2016, the Robert Malkin credit card incurred an expense for a flight from Miami to Los Angeles.

92.     On December 6, 2016, Robert Malkin flew from the Los Angeles area to Sacramento and rented a vehicle in Sacramento. On that same date, the Jason Malkin credit card incurred expenses at a location in Sacramento, and one in Redding. On December 6 and 7, the Scott Jungwirth credit card incurred expenses in Redding. On December 7, 2016, Habib and Jacobs flew from Baltimore to San Francisco. Jacobs rented a vehicle in San Francisco, which was returned on December 9, 2016. On December 8, 2016, the Jason Malkin credit card incurred an expense for a flight in the name Robert Malkin on December 11, 2016, and a flight for Jason Malkin from Los Angeles to Pittsburgh. Yet, the Jason Malkin credit card continued to incur expenses in northern California until December 12, 2016. On December 9, 2016, Habib and Jacobs flew from San Francisco to Washington D.C.

93.     On January 9, 2017, the Robert Malkin credit card incurred an expense in Milwaukee and on January 10, 2017, the Jason Malkin credit card incurred expenses for a flight from Los Angeles to Milwaukee. Jason Malkin, using this credit card, rented a car which was

25

returned in Pittsburgh. On January 11, 2017, Robert Malkin rented a vehicle in Pittsburgh, and then flew from Pittsburgh to Los Angeles.

94. On other dates in January and February 2017, the Jason Malkin credit card incurred expenses on three different occasions in Milwaukee. In addition, shortly thereafter, the Jason Malkin credit card incurred expenses at other locations known to be connected to the conspiracy. For example, on one occasion the Jason Malkin card incurred expenses in Milwaukee, then in Germantown, Maryland, and finally an expense for a flight from Washington D.C. to Los Angeles. On February 3, 2017, Habib flew from Milwaukee to Washington D.C., and one day later, the Jason Malkin card incurred a charge for a flight from Los Angeles to Milwaukee, with another rental vehicle expense.

95. On July 16, 2017, Robert Malkin rented a vehicle in Washington D.C., which he did not return until July 27, 2017. The Jason Malkin credit card incurred an expense on July 17, 2017, for a rental car from Milwaukee, with a return date of the same day, July 17, 2017, in Chicago, IL. The following day, July 18, 2017, the Scott Jungwirth credit card incurred an expense to fly from Redding, California to Baltimore, Maryland, while the Jason Malkin credit card incurred an expense to fly from Baltimore, Maryland to Los Angeles, California. This timeline coincides with the July 17, 2017, move-in date for the stash house located in Germantown, Maryland, which was rented in the name of Robert Malkin. Based on my training, experience, and familiarity with the investigation including these records, your affiant believes that Robert Malkin, Jason Malkin, and Scott Jungwirth were present in Maryland to assist with establishing the Germantown stash house.

96. A review by law enforcement of Lev Reys credit card accounts, including Citibank account statements, revealed that Reys flew to Milwaukee from Los Angeles on September 19,

26

2017, and then from Milwaukee to Baltimore on September 22, 2017. Reys then flew from Baltimore to Los Angeles on September 23, 2017. At the same time, records and cell-tower data place Robert Malkin in Milwaukee. Historical cell-tower information placed Robert Malkin in Milwaukee from September 19 – 21, 2017. A review of flight records revealed that on September 22, 2017, Robert Malkin traveled from Milwaukee to Baltimore – the same date that Reys flew to Baltimore.

97.     On November 8 – 9, 2017, Reys' credit card also incurred charges from a Holiday Inn hotel and Home Depot store in the Milwaukee area. Records received from the Holiday Inn revealed Reys rented a room the night of November 8 into November 9, 2017. A review of the transaction receipt from home Depot from November 9, 2017, revealed Reys purchased various household cleaning items and supplies including lockset(s), the identical air fresheners observed at 4100 W. Hillcrest #207 and 7992 N. 107th St., #6, and latex gloves.

98.     A review of the charge card accounts and airline records revealed a pattern in 2017 of Robert and Jason Malkin's travels overlapping with believed shipments of marijuana from California to Milwaukee and Maryland. The records also revealed that the Malkins' travel coincided with period where Reys and Habib made arrangements to establish the stash locations in Milwaukee WI and Germantown/Hagerstown, MD.

99.     On June 4, 2017, Jacobs and Habib were stopped by the Milwaukee County Sheriff's Department in a Nissan Maxima, known to be driven by Habib. Jacobs, a rear passenger in the vehicle, was issued a citation for possession of marijuana. The report indicates other occupants of the vehicle; however, it does not list their names. The report listed Jacobs' address as 6504 Osprey Point Ln., Alexandria, VA and that his address was verified.

100.     Subpoenaed credit card and hotel records further revealed that Jacobs and Hagos

both incurred charges on credit cards in their names at the InterContinental Hotel in Milwaukee. A review of hotel records revealed that on December 12, 2016, a room was rented under the name Colin Jacobs (Colin is middle name of Seth C. Jacobs). A room was also rented under the name Nahom Hagos for two nights, December 12 and 13, 2016.

101. Credit card records also reveal that Omar traveled with Habib to northern California on July 24, 2016; the flights were paid for by Jacobs.

**F.    Search and Arrest Warrant Execution**

102. On July 19, 2018, United States Magistrate Judge William E. Duffin, Eastern District of Wisconsin, issued a criminal complaint charging defendants Robert K. Malkin, Jason J. Malkin, Lev B. Reys, Fredric H. Birault, Scott A. Jungwirth, Seth C. Jacobs, Alae Arbi, Nahom Hagos, Mohammed E. Omar, And Lachelle Cook with conspiracy to possess with intent to distribute and to distribute marijuana in violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(B), and money laundering in violation of Title 18, United States Code, Section 1956(h). United States Magistrate Judge William E. Duffin issued arrest warrants for each of the individuals.

103. Also on July 19, 2018, search warrants were issued by United States Magistrate Judge William E. Duffin for Lachelle Cook's residence at 2866 N. 56th St., Milwaukee, and Corianne Markowski's residence at 2531 N. Murray Ave., Unit 1, Milwaukee.

104. On July 24, 2018, United States Magistrate Judge Michael Nachmanoff issued search warrants including for Seth Jacobs' residence at 6504 Osprey Point Lane, Alexandria, VA; the residence of Alae Arbi at 7507 Shirley hunter Way, Alexandria, VA; and, the residence of Mohammed Omar at 8418 Jovin Circle, Springfield, VA.

28

105. On July 25, 2018, the search warrants were executed and all of the individuals, except for Jacobs, were arrested on that date pursuant to the arrest warrants issued by United States Magistrate Judge William E. Duffin. Jacobs surrendered himself at a later date.

106. While conducting a search of Cook's residence at 2866 N. 56th St., Milwaukee, law enforcement authorities seized a quantity of marijuana, a digital scale, ammunition, documents as well as Devices (a)1 – 4.

107. While conducting a search at Markowski's residence at 2531 N. Murray Ave., Unit 1, Milwaukee, law enforcement authorities seized a quantity of marijuana, a digital scale, a .40 caliber pistol, ammunition, documents as well as Devices (b)1 – 6.

108. While conducting a search at Omar's residence at 8418 Jovin Circle, Springfiled, VA, law enforcement authorities seized a 9mm pistol, an assault rifle, a quantity of marijuana, documents, as well as Devices (c)1 – 12.

109. While conducting a search of Jacobs residence at 6504 Osprey Point Ln., Alexandria, VA, law enforcement authorities seized approximately $2,960 in U.S. currency as well as Devices (d)1 &2.

110. While conducting a search of Arbi's residence at 7507 Shirley Hunter Way, Alexandria, VA, law enforcement authorities seized documents as well as Devices (e)1 – 5. A search warrant was also obtained for a Penske rental truck which had been rented by Arbi and parked outside the residence. Law enforcement seized approximately $79,645 in U.S. currency from the rental truck.

111. Based upon the facts described above, that there is probable cause to believe that a search of the information contained within the above described Devices will produce evidence of a crime, namely evidence related to the possession and trafficking of marijuana; that through

29

affiant's training, experience and discussions with other experienced law enforcement officers, affiant is familiar with the ways in which drug traffickers conduct their unlawful trade, including their methods of distribution, their utilization of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their utilization of various forms of electronic devices to store and/or conceal illegal activity;

112.    Based upon my training and experience, affiant knows that individuals involved in drug trafficking frequently use cellular telephones to maintain contact with their sources of controlled substances as well as customers and co-conspirators in the distribution of controlled substances; that affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs; therefore records contained within said Devices will provide evidence related to the identity of said supplier(s), co-conspirators, and customers;

113.    Based upon my training and experience, affiant believes it is common for crime suspects who possess illegal narcotics to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal narcotics that they control, possess, buy and sell; furthermore, that these photographs and visual depictions are typically kept and maintained on their cellular devices.

114.    The Devices were seized during the execution of a warrant and are currently in the lawful possession of the Wisconsin Department of Justice, Division of Criminal Investigations (DCI).  Therefore, while the Wisconsin Department of Justice, DCI might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of

caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

115.    The Devices are currently in storage at 633 W. Wisconsin Ave., Suite 803 Milwaukee, Wisconsin 53203. In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the Wisconsin Department of Justice, DCI.

## IV.    TECHNICAL TERMS

116.    Based on my training and experience, I use the following technical terms to convey the following meanings:

> a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading

31

information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved

in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function

33

as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by compnters on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

117.  Based on my training, experience, and research, I know that the Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices

34

of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## V.    **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

118.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

119.    There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

35

peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37

121.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

122.    *Manner of execution.*    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VI.    CONCLUSION

123.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

## **ATTACHMENT A**

The property to be searched is as follows:

(a)1.  Apple iPhone Model number A1387.

(a)2.  Alcatel Flip Cellular phone.

(a)3.  Apple iPhone model A1687.

(a)4.  HP Pavilion Laptop.

(b)1.  Samsung Galaxy S8 Smartphone.

(b)2.  HP laptop with thumb drive inserted into laptop.

(b)3.  Amazon Kindle tablet.

(b)4.  Samsung Galaxy S5 smartphone.

(b)5.  ZTE smartphone.

(b)6.  Dell computer tower.

(c)1.  Black Apple iPhone with black rubber "tech21" case. Unknown model number.

(c)2.  Silver Apple MacBook Pro laptop, Model #: A1211.

(c)3.  Black Dell "Inspiron 15" laptop computer, S/N: GK6P832.

(c)4.  Silver Apple 16GB iPad with gray case, S/N:DMPJMND5DKPH.

(c)5.  Black 8GB tablet, unknown make or model.

(c)6.  Silver Apple iPad with cracked front screen, S/N: F9FN80XSFCM8.

(c)7.  Silver Samsung 16 GB cellphone, Model #: SM-J327T1, SW:

J327T1UVU1AQK6, IMEI: 354256/09/103958/6.

(c)8.  Silver Samsung 16 GB cellphone, Model #: SM-J327T1, SW:

J327T1UVU1AQK6, IMEI: 354256/09/194390/2.

(c)9.  Silver iPhone with cracked screen, Model #: A1533, IMEI: 013983003140300.

(c)10. Silver iPhone S with cracked screen, Model #: A1688, IC: 579C-E2946A.

(c)11. Black iPod, 8GB, S/N: 9C020RPV75J.

(c)12. Silver iPod, S/N: CCQNP3J1G22Y.

(d)1.   Samsung Chrome Notebook, black, S/N: 0Q9L91HJ400907Y.

(d)2.   Motorola androidone cellular telephone, silver, S/N: ZY224KQN3F.

(e)1.   Buffalo brand 1.0 TB High-Speed Portable Storage, S/N: 80223244903364.

(e)2.   Silver thumb drive in black leather "FL STUDIO" case, No S/N.

(e)3.   Acer Aspire E5-575 Series laptop computer, S/N:

NXGLBAA001706263517600.

(e)4.   Samsung cellular telephone, silver, Model: SM-J327P, DEC:

089162138406821714, HEX: 3551008681752

(e)5.   Samsung cellular telephone, black, Model: SM-S337TL (GP), S/N:

R28K50AALNH

Devices (a)1 – 4, (b)1 – 6, (c)1 – 12, (d)1 – 2, (e)1 – 5 and (f)1 – 2, collectively the

"Devices," are currently located at 633 W. Wisconsin Avenue, Suite 803, Milwaukee,

Wisconsin, 53203.

This warrant authorizes the forensic examination of the Devices for the purpose of

identifying the electronically stored information described in Attachment B.

2

## ATTACHMENT B

1. All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1) and 846; and Title 18, U.S.C. § 1956(h) including, but not limited to:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording schedules or travel;

   e. all bank records, checks, credit card bills, account information, and other financial records.

   f. Photographs and/or video depicting possession of drugs; and

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

1